**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., a Delaware Corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>U.S.A. GATEWAY, a Texas Corporation,<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _______________ |

**COMPLAINT**

Plaintiff, American Airlines, Inc. ("American"), through its attorneys, brings this action against Defendant U.S.A. Gateway d/b/a GTT Travel ("GTT" or "Defendant") for breach of contract, trademark infringement, unfair competition, and dilution. American has discovered that GTT and its sub-agents have been overcharging consumers, hiding charges from consumers, and actively engaging in prohibited ticketing practices, all of which are well outside the scope of authority American has granted them. These actions violate numerous clauses of GTT's contracts with American, and also constitute federal trademark infringement, false designation of origin, and dilution.

**NATURE OF THE ACTION**

1. GTT is a large air travel consolidator. It has negotiated with American (and other airlines) for access to certain fare codes, and for incentives based on overall volume of sales. GTT claims its "yearly turnover" is more than two billion dollars. GTT achieves this sales volume by signing up smaller travel agencies as sub-agents. GTT's sub-agents pay GTT for access to the fares GTT has negotiated. GTT profits from the fees it receives from its sub-agents as well as the commissions and incentives it receives from airlines.

2. American recently learned that GTT is breaching its contract with American in several ways. These include but are not limited to: failing to train sub-agents; failing to monitor its sub-agents' behaviors; engaging in forbidden ticketing practices; hiding travel agency fees and charges from consumers; charging consumers fictional fees which are not authorized by American; failing to report sub-agents' identities to American, and taking active steps to hide sub-agents' identities; and circumventing transparency requirements American imposes on all of its agents. These are just some of the legal breaches American has discovered; a complete accounting of all the permutations of these breaches would be too numerous to list.

3. GTT profits from these schemes in several ways. First, GTT's sub-agents are diverting consumers who wish to contact American directly, by tricking consumers into calling the wrong phone number. These consumers end up booking tickets through GTT, which increases GTT's bookings, commissions and incentives. In addition to the incentives GTT receives from American, GTT also receives money from its sub-agents. Typically, the sub-agents pay a fixed fee per booking (e.g., $20), plus a percentage of the overall booking (e.g., 3%) to GTT. So, when a sub-agent poses as American, GTT collects fees from the subagent, which GTT would not receive if the consumer contacted American directly as he or she intended. When GTT's sub-agents charge extra fees, GTT also gets a percentage cut of the extra fee.

4. Second, GTT and its sub-agents inflate the actual cost of the ticket, charging the consumer more than the actual ticket price. GTT and its sub-agents pocket the difference.

5. Third, GTT and its sub-agents use prohibited practices (i.e., "hidden city" ticketing) to lower the cost of the ticket, but do not pass this lower cost on to the consumer. GTT and its sub-agents again pocket the difference.

6. GTT is obligated to ensure its sub-agents act within the legal and ethical requirements set forth by American. It appears GTT is not monitoring, auditing, or imposing quality control standards on its sub-agents.

7. GTT's actions, and its sub-agents' actions, breach several of GTT's contractual duties to American; and GTT and its sub-agents can unjustly enrich themselves. American seeks all remedies available under the laws of the United States and the State of Texas.

8. GTT's actions, and its sub-agents' actions, outside the scope of authority granted to them, also constitute trademark infringement, unfair competition, and dilution. GTT and its sub-agents are wrongly leading consumers to believe their actions are sponsored or approved by American, when they are not.

9. Based on its knowledge of GTT's actions and upon information and belief, American alleges as follows:

## PARTIES

10. Plaintiff American Airlines, Inc., is a Delaware corporation with its worldwide headquarters in this District at 1 Skyview Drive, Fort Worth, Texas 76155.

11. Defendant U.S.A. Gateway, Inc. d/b/a GTT Travel ("GTT") is a Texas corporation with its headquarters in this District at 600 Data Drive, Suite 101, Plano, Texas 75075. It may be served with process by the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044.

## JURISDICTION

12. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1331 and § 1338. American asserts federal trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), and dilution under 15 U.S.C. § 1125(c). The

Court has supplemental and pendent jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

13. This Court has personal jurisdiction over GTT. GTT's "head office" is in Plano, Texas. The laws of Texas govern GTT's contract with American, and GTT's actions violate Texas law. GTT systematically does business in Texas, generally, and a number of the specific actions complained of herein took place in Texas. GTT has intentionally availed itself to the laws of Texas, and the exercise of jurisdiction over GTT is consistent with traditional notions of fair play and substantial justice.

14. This Court has jurisdiction over these claims pursuant to the Addendum to the Governing Travel Agency Agreements ("GTAA") which state that "[GTT] hereby submits and consents to the exclusive jurisdiction of the United States District Court for the Northern District of Texas and the Courts of State of Texas."

15. Venue is proper is in this District under 28 U.S.C. § 1391(b)(1) because GTT resides in this District. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claims occurred in this District. On information and belief, these include, but are not limited to: misusing data provided to GTT by American; assisting sub-agents in issuing improper tickets; assisting sub-agents in issuing improper fees, such as made-up "wheelchair" fees; and assisting sub-agents in hiding the excessive charges to consumers. These actions harmed both American and its customers and were taken by GTT personnel located in this District (as well as other locations).

## FACTUAL ALLEGATIONS

### A. American's Investment in Operations

16. Fort Worth-based American is one of the world's premier airlines. American's long-term investments in its fleet, information technology systems, personnel, industry partnerships, and customer service drive its success. Over its more than 90-year history, American has grown to be the largest commercial airline in the world, with the greatest number of passengers carried, the most revenue passenger miles flown, and the largest fleet of planes. American has carefully built and protected its global name recognition and goodwill, establishing itself as an industry innovator with reliable, quality customer service and valued customer relationships.

17. American has long been an industry leader on technology, information systems and applications to support its operations as well as the consumer experience. For example, American developed the travel reservation system SABRE, with assistance from IBM, in the 1950's and 1960's. Sabre was spun off from American in 2000 and American has continued its innovation by rolling out its New Distribution Capability (NDC), which comprises several innovations in operations, data, travel agency systems, and consumer-facing information and applications.

18. American invests substantial time, money and resources in developing data essential to its business. Developing routes and fare schedules requires balancing a complex matrix of factors, including the number of passengers likely to fly the route, the planes available to fly those routes and the number of passengers each plane can carry, the number of business travelers on that route, the number of casual or budget travelers on that route, the capacity of the airports at each end of the route, crew availability in the cities on that route, the availability of ramp, baggage, gate, ticket and customer service personnel, the common weather impacts on that route, and the presence of competitors flying competitive routes, just to name a few examples. American has

developed IT systems to support all these activities, and has developed algorithms and best practices for assembling, collating and filtering this data in a way that allows American personnel to make the right decisions on routes and fares.

19. American's fare and route schedules reflect American's best business judgment as to the complex matrix of factors discussed above, and this judgment includes not mere calculation but also insight, inspiration, creative problem solving, and analysis.

20. A successful route and fare schedule results in planes which are well utilized (the plane is full or nearly full) and customers who are highly satisfied. American's ability to develop route and fare schedules is substantially compromised when it receives false or misleading bookings.

**B. GTT's Contractual Relationship with American**

21. An airline ticket is a contract of carriage between American and the passenger. Because of this, only an authorized agent of American can issue a ticket to a passenger.

22. One can become an authorized agent of American by registering with either the International Airline Transport Association ("IATA") (for international agents) or the Airlines Reporting Corporation ("ARC") (for domestic agents). The scope of the agent's authority, standards, duties of care, rules and regulations are set forth in the Governing Travel Agency Agreements. The Governing Travel Agency Agreements include:

- For a domestic agent:
  - The ARC Agent Reporting Agreement ("ARC ARA")
  - The handbooks, rules and policies referenced in the ARC ARA.
  - American's Addendum to Governing Travel Agency Agreements ("Addendum")
- For an international agent:
  - The IATA Passenger Sales Agency Agreement ("IATA PASA").

- The handbooks, rules and policies referenced in the IATA PASA.
- American's Addendum to Governing Travel Agency Agreements.

It is possible for an agent to be both a member of IATA and registered with ARC.

23. For GTT, specifically, the Governing Travel Agency Agreements also include an incentive agreement, referred to as the "GTT Incentive Agreement" ("GTT Incentive Agreement"). The ARC ARA, Addendum, IATA PASA, and GTT Incentive Agreement are collectively referred to as the "GTAA").

24. GTT acts as American's legal agent, and its duties are set forth in these contracts, their related materials (such as handbooks), and the Addendum.

25. A "consolidator" like GTT is simply an agency that has negotiated unique incentives for hitting certain volume targets.[1] As part of this arrangement, GTT gains access to certain American Data, including discounted fare codes. American has authorized GTT to set up sub-agents and share this data with those sub-agents, but also requires transparency regarding GTT's sub-agents and for GTT to monitor it sub-agents to ensure they are complying with the applicable rules.

26. GTT is ARC accredited, which evidences GTT's agreement to the GTAA.

27. On information and belief, GTT or some of GTT's subsidiaries or affiliates are also IATA agencies.

28. GTT is responsible for the behavior of its sub-agents:

> To the extent that Agent or Agent's affiliates, or their respective employees, sub-agents, services vendors or other third-party contractors or representatives including sub-agents using a technology platform provided by Agent ("Agent Representatives") are involved in Agent's activities within the scope of the

[1] "Consolidator" is one of those terms that is often misused, and as a result there are many misconceptions about that term. The definition here, however, accurately describes GTT's relationship with American.

> Appointment, Agent will remain primarily responsible and liable to American for their full compliance with all of Agent's obligations under the Agreement.

(Addendum, p. 1.)

29. GTT is required to "maintain, at all times, ethical standards of business in its dealings with clients, the public, ARC, and Carriers," such as American. (ARC ARA, Section 3.3.)

30. GTT acknowledged and agreed that American is the owner of "American Data" as defined in Section 8(b) of the Addendum and that GTT's access and use of American Data "is solely for the purposes of and is limited to those activities that are within the scope of the principal-agent relationship." (Addendum, Section 8(b).)

31. GTT agreed to "keep confidential and not disclose to any third party the following confidential information of American: (i) any fare programs and commission arrangements that may be agreed with American; (ii) any and all post-booking data, including all PNRs, that cover American products and services; and (iii) any other American Data that American designates as confidential or is otherwise reasonably identifiable as confidential or proprietary information." (Addendum, Section 9(a).)

32. GTT agreed to "establish, implement, maintain, and use reasonable physical, technical and administrative safeguards for American Data." (Addendum, Section 9(c).)

33. GTT agreed to "strictly adhere" to American's conditions of carriage. (Addendum, Section 3(a).) American's conditions of carriage prohibit passengers from circumventing or exploiting ticket rules, including purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing); buying a ticket without intending to travel; back-to-back ticketing; booking a ticket in someone's name without the person's consent (which is illegal); and booking duplicate or impossible trips.

34. GTT agreed that its "systems, processes and sales practices [must] accurately display and convey all information relating to American's products and services as presented by American." (Addendum, Section 3(a).)

35. GTT agreed to make charges, and American's fares, transparent to consumers. "If Agent charges a service or other fee for the services that it provides to customers…such charges, fees (including any discounts) and compensation shall be listed separately from American's fare information in the shopping and booking process, so that the components and calculation of the final sale price is clear to the customer (e.g., the fare as published by American must always be separately displayed)." (Addendum, Section 3(d).)

36. GTT agreed "not to facilitate or enable the promotion, sourcing or booking of American products and services by third parties who are not authorized American Agents because of suspension or termination, including through the use of pseudo city codes used by or lent to or set up for such a third party, unless expressly authorized to do so by American." (Addendum, Section 3(g).)

37. GTT agreed not to engage in prohibited, abusive ticketing practices such as "Hidden City/Point Beyond Ticketing, Back to Back Ticketing, Throwaway Ticketing, Automated Re-Shopping…Duplicate and Impossible / Illogical Bookings and other Fraudulent, Fictitious, or Abusive Bookings." (Addendum, Section 3(g).)

38. GTT agreed not to engage in fraudulent activity. (Addendum, Section 3(e).)

39. GTT agreed not to "use a credit card which is issued in the name of [GTT], in the name of any of [GTT's] personnel, or in the name of any third party, other than the customer, his or her employer or a representative of the customer, to issue such tickets. Additionally, except for

tickets for private or contracted fares [GTT] is authorized to receive, [GTT] will ensure that American is the merchant of record for all transactions." (Addendum, Section 3(g).)

40. GTT has also entered into a Joint Business Incentive Agreement with American, which includes General Terms and Conditions and the North America Point of Sale Commercial Addendum (collectively the "GTT Incentive Agreement").

41. The most recent version of the GTT Incentive Agreement is dated October 13, 2022 with an Effective Date of July 1, 2022.

42. The GTT Incentive Agreement gives GTT access to certain fares. GTT receives this information in the form of data and content from American.

43. The GTT Incentive Agreement prohibits GTT from re-marketing or re-distributing these fares to another agent without American's consent.

44. In the GTT Incentive Agreement, GTT agrees and acknowledges fare schedules and inventory information are the sole property of American.

**C. GTT's Abuse of its Agency Relationship**

45. On information and belief, GTT shares American Data with its sub-agents knowing that they will misuse this data to engage in the very practices American has explicitly forbidden in the GTAA and the GTT Incentive Agreement.

46. Neither GTT nor its sub-agent bears the consequences of this action; only American and American's customers do.

47. Many of GTT's sub-agents have been engaged in operating websites and call centers that defraud consumers into believing that the sub-agents are doing business with American.

48. GTT's sub-agents routinely charge very large fees to consumers without their knowledge. This is often accomplished by simply lying to the consumer; if a ticket costs $500, the sub-agent simply tells the consumer that the "best price" for this trip is $800.

49. In some instances, the extra $300 charge is passed directly on to the consumer's credit card, so that the consumer would see a $500 charge to American on their bill, as well as a $300 charge from GTT. Frequent credit card chargeback requests demonstrate that consumers are not made aware of the real ticket price by GTT. GTT's approval of these fees, and its failure to require its sub-agents to abide by American's transparency rules, violates the GTAA.

50. In at least some instances, GTT actively helps its sub-agents hide the extra charges from consumers using a process it calls "in-house charge." In one instance, GTT's sub-agent booked a ticket for a passenger with one layover. The fare price was approximately $1,000, but the sub-agent quoted the passenger $1,500. GTT helped the sub-agent hide the additional $500 charge by using a process GTT calls an "in-house" charge. This appears to be GTT charging $1,500 to the consumer's credit card directly, and then using its own credit card or other payment to pay for the flight. In this way, the consumer only sees one $1,500 charge from GTT, instead of two separate charges. Using anything other than the consumer's credit card to pay for a ticket violates the GTAA.

51. GTT and its sub-agents charge egregious "change fees" where no such fee is authorized by American. In one instance, a passenger contacted GTT's sub-agent (likely inadvertently, as the passenger likely meant to contact American directly) for assistance with changing a flight. The sub-agent charged the passenger a $150 change fee and a $55 service fee. GTT approved this charge.

52. In another example, GTT received a chargeback on a ticket issued by its sub-agent, which charged a customer a $400 "tax fee," as shown below:

**Price Details (USD)**

**Flight Price Details**

| | Ticket Price | Tax Fee | Total |
|---|---|---|---|
| Flight Name | $ 1,086.00 | $ 400.00 | $ 1,486.00 |
| | | **Promo Discount:** | **- $ 0** |
| **Total Flight Booking Amount:** | | | **$ 1,486.00** |
| **Total Cost:** | | | **$ 1,486.00** |
| **Charged On Credit Card (Billed by GoTravelDesk)** | | **Card: ending with - ****** | **$ 1,486.00** |

53. There is no such thing as a "tax fee." Yet upon seeing this $400 "tax fee," GTT took no action to remedy its sub-agent's obvious fraud, as required by the GTAA.

54. GTT and its sub-agents routinely inflate the base fare of a ticket. For example, a passenger contacted a GTT sub-agent, and while the cost of the fare was $62, the sub-agent told the passenger the cost would be $284. The sub-agent passed this charge on to GTT – a $62 ticket with a $212 "miscellaneous" charge – and GTT approved it.

55. GTT and its sub-agents also book flight itineraries for passengers knowing that those passengers would miss their connecting flights, a prohibited practice known as "hidden city" ticketing. In once recent example, GTT booked *twenty* tickets on an itinerary that departed Dallas Fort Worth International Airport, stopped at Shanghai Pudong International Airport, and then went on to Hong Kong International Airport. *Seventeen* of these passengers simply got off at Shanghai and did not travel on to Hong Kong, leaving those seats empty.

56. On information and belief, GTT and/or one of its sub-agents did this because it was cheaper than booking these itineraries directly to Shanghai, but did not even pass the savings on to the consumer, but rather pocketed money for itself.

57. GTT profits from these kinds of booking violations in three ways. First they increase GTT's overall bookings and therefore its commissions and incentives. Second, the "fees" the sub-agents charge consumers increases the amount the sub-agent pays GTT – if the sub-agent has agreed to pay GTT 3% of all fees, then the more "fees" the sub-agent fabricates, the more money GTT makes. Third, GTT and its sub-agent can increase these fees further by using a prohibited booking practice. GTT and its sub-agent find a cheaper ticket by using one of these practices, but do *not* pass those savings onto the consumer; if the "proper" ticket is $800, but the prohibited booking is $700, GTT and its sub-agent still tell the consumer the ticket is $1,200; they are *not* passing on the "savings" from the prohibited booking practice.

58. GTT is obligated to ensure that its sub-agents are not engaging in abusive, prohibited practices or misappropriating American's data and content in a way that would injure American. But when GTT signs up its sub-agents, it merely has them complete a one- or two-page form which discusses little other than how GTT will get paid.

59. American has now identified several sub-agencies of GTT that have been committing fraud, and none of these subagencies ever received any training, monitoring, auditing, or warnings from GTT despite several red flags, including frequent credit card chargebacks and complaints. Based on this evidence, it appears GTT is focused exclusively on improving its bookings (so it can receive more incentives), without any concern that its sub-agents are generating these bookings by defrauding customers.

60. GTT is actively helping sub-agents harm American by issuing tickets it knows to violate American's booking policies.

61. GTT benefits because these transactions increase its overall commissions and incentives, regardless of how they were generated.

62. Given GTT's apparent disinterest in exercising any kind of quality control over its sub-agents, GTT's sub-agents are, on information and belief, also abusing personal customer data. Particularly, American has received reports and complaints from consumers who believed their credit card data was misused, who had their itineraries changed months after booking without notice, whose trip vouchers and credits were transferred, used or stolen without their knowledge, and who received unauthorized phone calls and emails from parties marketing other services which would have required knowledge of the passenger's itinerary. These complaints appear to be centered on foreign call centers which are, on information and belief, operated by GTT's sub-agents.

63. On information and belief, GTT lacks sufficient policies to ensure its sub-agents comply with the GTAA, prevent fraud and ensure the security of American Data.

64. GTT requires sub-agents to submit a GTT Agency Application. The GTT Agency Application primarily focuses on the potential sub-agent's credit history. It does not include any language related to the travel agency's integrity or fraud prevention.

65. If GTT accepts the agency as a sub-agent, GTT requires the sub-agent to sign a Sub-Agent Contract with GTT. The Sub-Agent Contract is only 1-2 pages in length, does not require the sub-agent to acknowledge any provision of the GTAA, and does not include any language regarding ethics, fraud prevention, or data security.

66. On information and belief, GTT does not provide its sub-agents with a copy of the GTAA.

67. On information and belief, GTT does not monitor its sub-agents for compliance with the GTAA.

68. These practices harm American in several ways. Consumers are paying inflated prices for tickets believing the ticket prices to be genuine; they are paying imaginary fees believing the fees to be genuine; they are receiving itineraries that do not comply with American's rules (for example, the minimum time to get from a flight to a connecting flight); they are exposed to improper booking practices which leads consumers to think these practices are "ok;" they are arriving at airports to find they do not have issued tickets, or have missed their connections, or do not have a seat in the class they thought they paid for. These practices damage American's relationship with its consumers, damage the value of its brand, and cause American to expend substantial effort in re-booking or accommodating passengers.

69. These practices also harm passengers, whose travel experience is substantially poorer due to their business relationships with GTT or a GTT sub-agent.

**D. American's Valuable Trademarks**

70. American has developed global name recognition and goodwill. Its brands, trade names, and other intellectual property are the result of significant investment and worth billions of dollars. For decades, American has used and continues to use the trade name "American Airlines" and many trademarks and service marks, including on AA.com. American also has used designs such as its "Flight Symbol" to promote its products and services throughout the world:



71. American uses the "American Airlines" mark and ("Flight Symbol") design (together, "American Marks"), alone and in combination with other words and designs, in

connection with loyalty programs, discount programs, incentive award programs, transportation services, and travel-related services, in interstate commerce, and in commerce in the State of Texas.

72. To protect its major investment in its intellectual property, American registers the American Marks in the U.S. Patent and Trademark Office ("USPTO") on the Principal Register. American also registers the American Marks in many other countries.

73. The registered American Marks include the following:

| Mark/Name | Reg. No. | Reg. Date | Services |
|---|---|---|---|
| **AMERICAN AIRLINES** | 4939082 | April 19, 2016 | (Int'l Class: 35)<br>Sales promotion; promoting the goods and services of others by means of a loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites ofothers in the field of books, computers, software,office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise.<br><br>(Int'l Class: 37)<br>Repair and maintenance of aircraft, vehicles, aircraft-related facilities, baggage-related facilities, and air travel-related facilities; refueling of aircraft and land vehicles; ground support services in the field of air transportation, namely, aircraft de-icing services, aircraft interior and exterior cleaning, and sanitation.<br><br>(Int'l Class: 39)<br>air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, providing air transportation reservation services for others, providing vehicle reservation services for others, providing cruise reservation services for others, and providing vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individualsand for groups; providing |

| | | | |
|---|---|---|---|
| | | | information in the field of travel by means of a global computer network; providing lounge facilities, namely, airport services featuring transit lounge facilities for passenger relaxation and also including shower facilities<br><br>(Int'l Class: 41)<br>Providing online electronic publications, namely,online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of an inflight entertainment system; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of a personal computer or tablet.<br><br>(Int'l Class: 43)<br>Food and drink catering; providing food and beverage services in conjunction with providingfacilities in the form of a private club for conducting business, meetings and conferences;providing conference room facilities, food and beverage lounge facilities, and amenities, namely, food, drink, catering, and restaurant; providing hotel reservation and coordination services for others by means of a global computer network; travel agency services, namely, making reservations and booking for temporary lodging; entertainment services, namely, providing a general purpose arena facility for sports, entertainment, trade shows, exhibitions and conventions. |
| **AMERICAN AIRLINES** | 5279167 | Sep. 5, 2017 | (Int'l Class: 09)<br>computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status<br><br>(Int'l Class 38) Providing Internet access |

| | | | |
|---|---|---|---|
| **AMERICAN AIRLINES** | 5592865 | Oct. 30, 2018 | (Int'l Class: 36)<br>Issuance of credit cards through a licensee |
| **AMERICAN AIRLINES** | 5573314 | Oct. 2, 2018 | (Int'l Class: 25)<br>Clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear<br><br>(Int'l Class:28)<br>Toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards<br><br>(Int'l Class: 36)<br>Banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; Issuance of credit cards through a licensee |
| Design Only | 4449061 | Dec.10, 2013 | (Int'l Class: 35)<br>promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership.<br><br>(Int'l Class: 39)<br>air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network.<br><br>(Int'l Class: 43)<br>providing travel agency services, namely, providing temporary lodging reservation services for others. |
| Design Only | 5559145 | Sep.11, 2018 | (Int'l Class: 25) |

| | | | |
|---|---|---|---|
| | | | clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear<br><br>(Int'l Class: 28)<br>toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards<br><br>(Int'l Class: 35)<br>promoting goods and services of others by means of loyalty program, discount program, promotional program and an incentive awards program whereby points are earned or awarded for purchases made by members which can then be redeemed for merchandise, services and travel; promoting goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, gift cards, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; provision, organization, operation, and administration of a loyalty program, a discount program, a promotional program and an incentive awards program for customers whereby points are earned for purchases made via credit cards which can be redeemed for merchandise, services and travel; provision, organization, operation, and administration of loyalty, discount, promotional, and incentive programs, namely, managing and tracking the transfer and redemption of points that are earned or awarded for purchases made by members; provision of clerical and secretarial services; providing facilities, office machines and equipment for conducting business, business meetings, and conferences; providing professional support staff to assist in the conducting of office business, meetings and conferences; promotion of travel insurance services of others.<br><br>(Int'l Class: 36)<br>banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; issuance of credit cards through a licensee<br><br>(Int'l Class: 38)<br>providing internet access<br><br>(Int'l Class: 39) |

| | | | |
|---|---|---|---|
| | | | air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services in the nature of coordinating travel arrangements for individuals and groups; providing information in the field of travel; ground support services in the field of air transportation, namely, marking, sorting, loading, unloading, transfer, and transit of cargo and passengers' luggage; providing information concerning cargo and passengers' luggage in transit and delivery; air travel passenger ticketingand check-in services; airport ramp services; transporting aircraft at airport; providing aircraft parking and storage; aircraft towing; transportation services, namely, checking of baggage; airport services featuring transit loungefacilities for passengers; booking and providing ancillary travel services, namely, making reservations in the nature of seat selection, baggage check-in; airport ramp services, namely,transfer of checked baggage to aircraft; airport ramp services, namely, transfer of carry-on baggage to aircraft; airline services, namely, providing priority boarding for customers, and access to airport lounge facilities; air passenger wheel-chair services at airport; leasing of aircraft; leasing of components of aircraft; leasing of aircraft engines; transporting of aircraft engines for others; airport services featuring transit lounge facilities for passengers.<br><br>(Int'l Class: 41)<br>providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight and airport lounge entertainment services, namely, providing movies, audio and audio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, audio books, tablets, video and online games, and children's programming; travel services, namely, providing headphones on aircraft for use for entertainment purposes<br><br>(Int'l Class: 43)<br>providing conference rooms; food and drink catering; café services; restaurant services; bar services; providing conference room facilities; providing lounge facilities for providing food and drink; providing hotel reservation and coordination services for others; hotel services; restaurant services, namely, providing of food and drink in airports and on aircraft<br><br>(Int'l Class: 45) |

| | | | |
|---|---|---|---|
| | | | facilitating expedited passenger screening, namely, providing priority access to airline passenger and baggage security screening |
| | 5441150 | April 10, 2018 | (Int'l Class: 36)<br>issuance of credit cards through a licensee |
| AMERICAN and Design<br><br>American | 5288639 | Sep. 19, 2017 | (Int'l Class: 35)<br>sales promotion; promoting the goods and services of others by means of loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the fields of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise<br><br>(Int'l Class: 39)<br>air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individuals and for groups; providing information in the field of travel by means of a global computer network |

74. In addition to its registered rights, American has strong common-law rights in the American Marks by virtue of extensive use and promotion in commerce.

75. The American Marks serve as unique and famous source identifiers for American and various travel services.

76. American has invested millions of dollars in worldwide advertising and marketing to build the fame, reputation, and goodwill of the American Marks. It advertises through a variety

of media, including television, the internet, radio, newspapers, magazines, and direct mail, across the country and the world.

77. The American Marks are distinctive designations of the source of origin of American's services. They are uniquely associated with it and its high-quality services and are assets of incalculable value as symbols of American, its quality services, and its goodwill.

78. The American Marks are famous and became famous before GTT and its sub-agents' infringement began.

79. GTT's sub-agents are using the American Marks to deceive consumers into believing they are communicating with American when they are not. Particularly, several sub-agents of GTT have used call centers in foreign countries, primarily India, in combination with deceptive websites, keyword advertising and social media posts to trick consumers into calling a toll-free number which purports to be American's toll-free number, but is not. On information and believe, GTT is aware of these sub-agents' activities but has taken no steps to terminate these sub-agents. Instead, GTT actively assisted sub-agents in issuing false and excessive charges to consumers.

80. GTT and its sub-agents have also used the American Marks to deceive consumers by acting in ways which American has not authorized. For example, when GTT and a sub-agent charge a customer a "fee" which adds 50% to the cost of a ticket, GTT and the sub-agent are causing the consumer to believe that this unauthorized charge is affiliated with American, or that the ticket is substantially more expensive than it really is.

## COUNT I

## (Breach of GTAA)

81. American realleges the material facts alleged in the preceding paragraphs as if fully set forth within.

82. The GTAA is a valid enforceable contract, is "binding between Agent (GTT) and each Carrier (American) that appoints Agent, and establishes a principal-agent relationship between Agent and Carrier." (ARA Section 1.2.) GTT is bound by this contract. American has met all conditions precedent to and otherwise complied with the contract.

83. GTT is responsible for the behavior of its sub-agents. (Addendum, p. 1.)

84. GTT and its sub-agents must "seek to maintain, at all times, ethical standards of business in its dealings with clients, the public, ARC, and Carriers," including American. (ARA, Section 3.3.)

85. GTT and its sub-agents have engaged in unethical standards of business in breach of the GTAA with American. Specifically, GTT's sub-agents are using American's tickets, data and content to engage in abusive practices and fraudulent activity, including by misrepresenting themselves to consumers, improperly seaming tickets, falsely representing certain tickets are not available, inflating ticket prices, charging made-up fees such as "wheelchair" fees, seat assignment fees, and unauthorized baggage fees, hiding agency charges from customer, and misappropriating American's data and content in order to accomplish this.

86. GTT agreed not to engage in prohibited, abusive ticketing practices such as "Hidden City/Point Beyond Ticketing, Back to Back Ticketing, Throwaway Ticketing, Automated Re-Shopping…Duplicate and Impossible / Illogical Bookings and other Fraudulent, Fictitious, or Abusive Bookings." (Addendum, Section 3(g).)

87. GTT and its sub-agents are routinely engaging in these prohibited, abusive ticketing practices.

88. Pursuant to the GTAA, GTT agreed to "keep confidential and not disclose to any third party the following confidential information of American: (i) any fare programs and commission arrangements that may be agreed with American; (ii) any and all post-booking data, including all PNRs, that cover American products and services; and (iii) any other American Data that American designates as confidential or is otherwise reasonably identifiable as confidential or proprietary information." (Addendum, Section 9(a).) GTT also agreed to "establish, implement, maintain, and use reasonable physical, technical and administrative safeguards for American Data." (Addendum, Section 9(c).)

89. GTT has not established reasonable safeguards for American Data or for passenger data, for itself or for its sub-agents, and does not even instruct its sub-agents to take reasonable care with respect to any data. As a result, on information and belief, GTT and/or its sub-agents are routinely misusing credit card data, passenger record data, and American Data, including but not limited to using this data to commit fraud.

90. GTT agreed to make charges, and American's fares, transparent to consumers. "If Agent charges a service or other fee for the services that it provides to customers…such charges, fees (including any discounts) and compensation shall be listed separately from American's fare information in the shopping and booking process, so that the components and calculation of the final sale price is clear to the customer (e.g., the fare as published by American must always be separately displayed)." (Addendum, Section 3(d).)

91. GTT and/or its sub-agents routinely charge very large fees to consumers without their knowledge. Further, GTT actively assists its subagents in hiding these fees from consumers

through its "In-House Charge" process. On information and belief, GTT and/or its sub-agents also use other methods to hide their charges from consumers.

92. GTT agreed not to "use a credit card which is issued in the name of [GTT], in the name of any of [GTT's] personnel, or in the name of any third party, other than the customer, his or her employer or a representative of the customer, to issue such tickets. Additionally, except for tickets for private or contracted fares [GTT] is authorized to receive, [GTT] will ensure that American is the merchant of record for all transactions." (Addendum, Section 3(g).)

93. Despite this, GTT and/or its sub-agents have been using its own credit card or other payment method to pay for a consumers' flight, in violation of the GTAA. In this way, the consumer only sees one charge from GTT, instead of two separate charges.

94. Pursuant to the GTAA, GTT and its sub-agents are prohibited from engaging in abusive practices and fraudulent activities. (Addendum, Section 3(e).)

95. GTT has not been monitoring or policing its sub-agents' abusive and prohibited ticketing practices. To the contrary, GTT encourages these practices.

96. On information and belief, GTT is well aware of its sub-agents' activities, including its sub-agents' practice of masquerading as American Airlines, and has taken no action to stop these activities.

97. Pursuant to Page 18 of the GTT Incentive Agreement, GTT "may not re-market or re-distribute Consolidator Fares to or through other distributors, agent or intermediators" unless the other agent has "acknowledged and agreed to the property rights of the [American] and the restrictions set forth in the GTT Incentive Agreement."

98. GTT has re-marketed and re-districted Consolidator Fares to sub-agents who have not agreed to the property rights of [American] and the restrictions set forth in the GTT Incentive Agreement.

99. The GTAA also provides that "Agent will not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment." (Addendum, Section 4.)

100. GTT is issuing tickets for transportation on American on behalf of Kiwi.com, Inc., an agency that American has terminated for violating terms of its agreement with American and engaging in abusive ticketing practices.

101. GTT and its sub-agents have been unjustly enriched by these breaches, to American's detriment in that they have abused the authority granted to them to enrich themselves and harm American.

102. GTT's multiple breaches cause damage to American in several ways, including but not limited to: damage to American's goodwill, reputation, and relationship with its customers; costs incurred in repairing improperly booked tickets and in addressing customer service issues caused by GTT's breaches; lost ticket and booking fees; expenditure of fuel and personnel to accommodate passengers who do not appear for their flights; and legal fees American has incurred in investigating and unraveling GTT's sub-agents' practices.

**COUNT II**

**(TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114)**

103. American realleges the material factual allegations in the preceding paragraphs.

104. The American Marks are inherently distinctive and continue to acquire distinctiveness and goodwill in the marketplace through American's use of those marks in

commerce. As a result of its widespread and continuous use, American Marks have become associated in the minds of travelers and travel loyalty program users with American. The reputation and goodwill that it has built up in American Marks is of great value to American.

105. The types of services for which GTT and its sub-agents use American Marks are identical or substantially similar to services offered by American.

106. GTT and its sub-agents' conduct has caused and is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of GTT with American, or as to the origin, sponsorship, or approval of GTT's goods and services by American, as the unauthorized fees, charges and abusive practices by GTT and its sub-agents are likely to be confused by consumers as having originated with or endorsed by American.

107. The acts of GTT and its sub-agents constitute infringement of one or more American Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

108. American has suffered and will continue to suffer harm as a result of GTT and its sub-agents' infringement of the American Marks.

109. American is entitled to monetary damages for GTT and its sub-agents' infringement.

110. GTT and its sub-agents acted with knowledge of American's ownership of the American Marks and with a deliberate intent or willful blindness to unfairly benefit from the goodwill symbolized by the marks. GTT and its sub-agents willfully infringed one or more of the American Marks, and the intentional nature of GTT and its sub-agents' actions makes this case exceptional under 15 U.S.C. § 1117(a).

111. American has sustained injury, damage, and loss based on GTT and its sub-agents' infringement.

## COUNT III

### (FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(A))

112. American realleges the material factual allegations in the preceding paragraphs.

113. American has federal trademark rights in the American Marks.

114. GTT and its sub-agents are displaying and using the American Marks in interstate commerce purporting to act as an online travel agency for American but are engaging in unauthorized ticketing practices and are issuing unauthorized charges to consumers.

115. GTT and its sub-agents' conduct does and is likely to cause confusion, mistake, or deception as to its affiliation, connection, or association with American, or as to the origin, sponsorship, or approval of GTT and its sub-agents' ticketing practices and fees.

116. GTT and its sub-agents' acts constitute false designation of origin, which is likely to cause and have caused confusion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

117. The intentional nature of GTT and its sub-agents' actions entitles American to recover profits, damages, and attorney fees under 15 U.S.C. § 1117(a).

118. American has sustained injury, damage, and loss based on GTT and its sub-agents' actions.

## COUNT IV

### (Dilution under 15 U.S.C. § 1125(c))

119. American realleges the material factual allegations in the preceding paragraphs.

120. The American Marks achieved fame under the relevant terms of the Lanham Act in that they are widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner, American.

121. GTT and its sub-agents' unauthorized, infringing use outside the scope of their authority occurred after the American Marks achieved such fame.

122. GTT and its sub-agents' unauthorized use of the American Marks has lessened and will continue to lessen the capacity of American's famous and distinctive American Marks to distinguish American's products and services from those of others and has diluted the distinctive quality of the famous and nationally recognized American Marks, in that the abusive and improper activities by GTT and its sub-agents are likely associated with American in the eyes of consumers.

123. GTT and its sub-agents derived and continue to derive substantial revenue and profits from their past and ongoing dilution of the American Marks as a result of their unauthorized uses of the American Marks.

124. GTT and its sub-agents acted with knowledge of American's ownership of the American Marks and with deliberate intent or willful blindness to unfairly benefit from goodwill symbolized by the marks. Indeed, GTT and its sub-agents agreed to enforceable contract terms recognizing American's exclusive rights to the American Marks and to only use such marks in an authorized matter, and yet used the American Marks for activities which are explicitly forbidden by American.

125. GTT and its sub-agents' conduct did and is likely to dilute the value of the American Marks.

126. GTT and its sub-agents' acts constitute a dilution, including by blurring and tarnishment, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

127. The factors identified in the Trademark Dilution Revision Act compel the conclusion that dilution is "likely." In particular, (i) GTT and its sub-agents use the actual American Marks; (ii) the American Marks have significant inherent and/or acquired

distinctiveness; (iii) American is engaging in substantially exclusive use of the American Marks; (iv) the American Marks are indisputably world famous; (v) GTT and its sub-agents intended to create an association between their services and the American Marks; and (vi) on information and belief, GTT and its sub-agents' conduct has already caused GTT and its sub-agents' customers to actually associate GTT and its sub-agents' activities with the American Marks.

128. The acts of GTT and its sub-agents have caused harm to the reputation of the American Marks due to the deceptive, poor quality, and nature of the services and products provided by GTT and its sub-agents.

129. The intentional nature of GTT and its sub-agents' actions entitle American to recover profits, damages and costs, and attorney fees under 15 U.S.C. § 1117(a).

**ATTORNEY FEES**

130. American realleges the material factual allegations in the preceding paragraphs.

131. American was required to retain legal services in prosecution of these claims. Pursuant to at least Tex. Civ. Prac. & Rem. Code § 38.001 and 15 U.S.C. § 1117(a) American seeks its reasonable and necessary attorney fees.

**CONDITIONS PRECEDENT**

132. All conditions precedent to these claims have been performed by American, been waived, or occurred.

**PRAYER FOR RELIEF**

For these reasons, upon proper hearing or final trial, American respectfully requests the following relief:

a. That GTT be cited to appear and answer in this case;

b. That the court set a trial date;

c. That this Court find that GTT has unlawfully infringed upon the American Marks, engaged in unfair competition, all in violation of the Lanham Act;

d. That American be fairly compensated for the damages set forth herein;

e. That GTT be ordered to pay American's attorneys' fees;

f. That GTT pay prejudgment and post-judgment interest at the highest rate possible; and

g. That American be granted all other relief, at law or in equity, to which American is justly entitled.

Dated: July 26, 2023

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Lars L. Berg
State Bar No. 00787072
lars.berg@kellyhart.com
Tyson Lies
State Bar No. 24087927
Tyson.lies@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
Julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: 202-331-3100
Facsimile: 202-331-3101
(*pro hac vice application forthcoming*)

Cameron M. Nelson
nelsonc@gtlaw.com
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-6590
Facsimile: (312) 456-8435
(*pro hac vice application forthcoming*)

**ATTORNEYS FOR PLAINTIFF
AMERICAN AIRLINES, INC.**